,

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF WASHINGTON

ESTATE OF CHRIS ROGERS, by
and through personal representative,
STEVEN ROGERS,

                    Plaintiff,

     v.

NAPHCARE, INC., an Alabama
Corporation,

                Defendants.

NO. 2:20-CV-0467-TOR

ORDER ON PENDING MOTIONS
(ECF Nos. 29, 32, 33, 34, and 35)

BEFORE THE COURT are Plaintiff's Motion for Partial Summary Judgment (ECF No. 29), Defendant's Motions for Partial Summary Judgment (ECF Nos. 32, 33), and Defendant's Motions to Strike and Exclude Experts (ECF Nos. 34, 35). These matters were submitted for consideration without oral argument. The Court has reviewed the record and files herein and is fully informed. For the reasons discussed below, Defendant's Motion for Partial Summary Judgment (ECF No. 33) is **GRANTED**. Defendant's Motion for Partial

ORDER ON PENDING MOTIONS ~ 1

Summary Judgment (ECF No. 32) is **GRANTED**.  Defendant's Motions to Strike and Exclude Experts (ECF Nos. 34, 35) are **DENIED.**  Plaintiff's Motion for Partial Summary Judgment (ECF No. 29) is **DENIED as moot**.

## BACKGROUND

This matter arises from the death of Chris Rogers ("Mr. Rogers") while he was being held in pre-trial custody at Spokane County Jail ("SCJ").  The following facts are not in dispute except where noted.

Defendant NaphCare, Inc. ("Defendant") provides medical and mental health care services to inmates at SCJ pursuant to a Health Services Agreement ("Agreement").  ECF No. 59 at 2, ¶¶ 1, 3.  Under the terms of the Agreement, an employee for Defendant performs the initial intake assessment for inmates, which includes identifying urgent medical and mental health issues.  *Id*. at 3, ¶ 8.  If an inmate requires additional mental health services, the inmate is referred for further evaluation by a higher-level mental health professional.  *Id*. at 4, ¶ 10.  Defendant contends the Agreement deferred additional mental health care to SCJ employees.  ECF No. 71 at 10–13.  Plaintiff asserts Defendant was required to provide the additional mental health care under the Agreement.  *Id*.  The Agreement states Defendant's services would be integrated with SCJ's existing mental health providers, including maintaining shared medical records, continuing current

psychiatric medications, and initiating psychotropic medication for certain

psychiatric conditions.  ECF No. 37-1 at 23.

On the night of November 28, 2017, Mr. Rogers was arrested and booked

into SCJ.  ECF No. 36 at 2, ¶ 1.  An employee for Defendant conducted Mr.

Rogers's medical and pre-screening intake exam.  *Id*. at 4, ¶ 1.  Mr. Rogers was

placed on suicide watch at that time because he had made suicidal statements to the

arresting officers.  *Id*.  Mr. Rogers was initially uncooperative and was placed in a

back holding cell.  *Id*., ¶ 2.  He remained on suicide watch.  *Id*.  Once he became

cooperative, Mr. Rogers was removed from the holding cell to complete the

booking process.  *Id*., ¶ 3.  He continued to be on suicide watch.  *Id*.  The intake

process was completed by 7:30 a.m. on November 29, 2017.  ECF No. 59 at 6, ¶¶

20–21.  Mr. Rogers was removed from suicide watch at 10:27 a.m. on November

29, 2017 after undergoing a mental health evaluation with an SCJ employee.  ECF

No. 36 at 5, ¶¶ 6–7.  The initial intake notes indicated Mr. Rogers made suicidal

statements to the arresting officers, told the officers he was having auditory

hallucinations, and stated he had a history of drug and alcohol abuse.  ECF No. 71

at 13.  The mental health evaluation notes also indicated active delusions.  ECF

No. 36 at 5, ¶ 8.

The day before Mr. Rogers's arrest, he was prescribed an injectable

antipsychotic, Risperdal (generically known as risperidone), to be administered

every two weeks.  ECF No. 71 at 9.  Mr. Rogers was due for the first injection on the same day, November 28, 2017.  *Id*.  The parties dispute whether Mr. Rogers received the injection.  *Id*.  Between November 30, 2017 and December 5, 2017, Mr. Rogers was prescribed and administered daily doses of oral risperidone.  ECF No. 36 at 5–6, ¶¶ 9–16.  An employee for Defendant oversaw the prescription.  *Id*., ¶¶ 9, 17.  The oral risperidone was discontinued on December 6, 2017.  *Id*. at 7, ¶ 19.  Mr. Rogers's prescriptions were reevaluated between December 6, 2017 and December 8, 2017 under the supervision of Defendant's employees and Mr. Rogers's prior mental health provider.  *Id*., ¶¶ 19–24.  Beginning December 6, 2017, Mr. Rogers began taking an antidepressant, prescribed by an employee for Defendant.  *Id*. at 8, ¶ 20.  Between December 8, 2017 and December 11, 2017, Mr. Rogers was not administered an antipsychotic medication.  *Id*. at 7–8, ¶¶ 20–29.  On December 12, 2017, Mr. Rogers received an injection of Risperdal.  *Id*. at 8, ¶ 30.

Mr. Rogers underwent a mental health assessment on December 13, 2017, which was performed by an SCJ mental health professional.  *Id*., ¶ 31.  Mr. Rogers indicated he was hearing voices but denied thoughts of self-harm.  *Id*.  Mr. Rogers again reported hearing voices on December 18, 2017.  *Id*. at 10, ¶ 42.  An SCJ mental health professional met with Mr. Rogers to assess his symptoms.  *Id*.  On December 20, 2017, an employee for Defendant met with Mr. Rogers to review his

medication.  *Id.*, ¶ 44.  The notes indicated that Mr. Rogers's psychiatric condition remained generally unchanged, but the dosage for his antidepressant was increased and he was re-prescribed a daily dose of oral Risperdal.  ECF No. 36 at 10, ¶ 44.

On December 22, 2017, Mr. Rogers was placed in a restraint chair and put on 15-minute suicide watch after he placed a towel around his neck and tried to tie it.  *Id.* at 11, ¶ 48.  There is conflicting evidence regarding the reason for Mr. Rogers's actions.  Mr. Rogers's mother testified that Mr. Rogers told her he did this for sexual gratification rather than an attempt at suicide.  ECF No. 37-1 at 186–87.  However, the medical records indicate Mr. Rogers told Defendant's employee "the voices told him to" tie the towel around his neck.  ECF No. 29-2 at 73–80.  The suicide watch was discontinued on December 23, 2017 after Mr. Rogers was evaluated by an SCJ mental health professional.  ECF No. 36 at 11–12, ¶¶ 50–51.

Mr. Rogers requested to speak with a mental health professional on December 27, 2017.  *Id.* at 12, ¶ 57.  The next morning, on December 28, 2017, Mr. Rogers was placed under a suicide watch after mental health employees received a report that he had tied a sheet around his neck for "sexual reasons."  *Id.* at 13, ¶ 60.  Mr. Rogers was assessed by an SCJ mental health professional who informed him of the dangers of his behavior.  *Id.*, ¶ 61.  Mr. Rogers was due for another injection of Risperdal on December 28, 2017 but did not receive the

medication because it was unavailable at the pharmacy.  ECF No. 36 at 13, ¶ 64.

He did continue to receive the oral doses of risperidone and the antidepressant.  *Id*.

Mr. Rogers met with an employee for Defendant on December 29, 2017 to

discuss Mr. Rogers's "neck burn" arising from the December 23, 2017 towel

incident.  *Id*., ¶ 65.  Mr. Rogers requested to speak with mental health staff the

following day, December 30, 2017.  *Id*. at 14, ¶ 67.  Mr. Rogers reported to an SCJ

mental health professional that he was experiencing auditory hallucinations.  *Id*., ¶

68.  The mental health professional worked through the hallucinations with Mr.

Rogers and ensured he was not suicidal.  *Id*.

On the morning of January 3, 2018, Mr. Rogers was administered his

morning dose of oral antipsychotic medication at 10:41 a.m.  *Id*. at 15, ¶ 1.  At

11:10 a.m., Mr. Rogers was found hanging in his cell.  *Id*., ¶ 2.  He was

unresponsive and code blue.  *Id*.  Mr. Rogers died on January 6, 2018 from a brain

injury due to asphyxiation from hanging.  *Id*., ¶ 3.

Plaintiff is the personal representative for the Estate of Chris Rogers.

Plaintiff filed a Complaint for damages on December 21, 2020.  ECF No. 1.

Spokane County was a named defendant until its dismissal on September 22, 2022.

ECF No. 23.  Defendant filed two Motions for Partial Summary Judgment on

January 25, 2023.  ECF Nos. 32, 33.  One addresses Plaintiff's state law claims

(ECF No. 32) while the other addresses Plaintiff's federal law claims (ECF No.

33).  Defendant also filed two Motions to Exclude and Strike Experts.  ECF Nos. 34, 35.  Plaintiff filed his own Motion for Partial Summary Judgment on January 25, 2023, seeking judgment only as to Defendant's duty to provide health care to Mr. Rogers, and breach thereof.  ECF No. 29.

## DISCUSSION

## I.    Legal Standard

The Court may grant summary judgment in favor of a moving party who demonstrates "that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  In ruling on a motion for summary judgment, the court must only consider admissible evidence.  *Orr v. Bank of America, NT & SA*, 285 F.3d 764 (9th Cir. 2002).  The party moving for summary judgment bears the initial burden of showing the absence of any genuine issues of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  The burden then shifts to the non-moving party to identify specific facts showing there is a genuine issue of material fact.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986).  "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff."  *Id*. at 252.

For purposes of summary judgment, a fact is "material" if it might affect the outcome of the suit under the governing law.  *Id.* at 248.  Further, a dispute is

"genuine" only where the evidence is such that a reasonable jury could find in favor of the non-moving party. *Id.* The Court views the facts, and all rational inferences therefrom, in the light most favorable to the non-moving party. *Scott v. Harris*, 550 U.S. 372, 378 (2007). Summary judgment will thus be granted "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322.

### A. Section 1983 Claims

Plaintiff raises three causes of action for violations of 42 U.S.C. § 1983. ECF No. 1 at 17–20, ¶¶ 68–81, at 21–22, ¶¶ 88–92. Defendant moves for summary judgment on each of the claims, arguing there is no evidence of an unconstitutional custom or policy or that Defendant acted with deliberate indifference. ECF No. 33.

A pretrial detainee has a substantive due process right under the 14th Amendment to be protected from harm during custody. *Castro v. Cty. of Los Angeles*, 833 F.3d 1060, 1067 (9th Cir. 2016). That right includes the right to receive adequate medical care and attention to imminent risks of suicide. *Horton by Horton v. City of Santa Maria*, 915 F.3d 592, 599 (9th Cir. 2019).

As a private entity acting under the color of state law, Defendant may be subject to municipal liability. *Tsao v. Desert Palace, Inc.*, 698 F.3d 1128, 1139

(9th Cir. 2012).  There are three avenues to imposing *Monell* liability.  First, a local government entity may be held liable if it has implemented official policies, procedures, or established customs that inflict constitutional injuries.  *Clouthier v. County of Contra Costa*, 591 F.3d 1232, 1249 (9th Cir. 2012) *overruled on other grounds by Castro v. Cty. of Los Angeles*, 833 F.3d 1060 (9th Cir. 2016) (quoting *Monell v. Dep't of So. Serv.*, 436 U.S. 658, 708 (1978)).  Absent a formal policy, a plaintiff must show a "longstanding practice or custom which constitutes the standard operating procedure of the local governmental entity." *Trevino v. Gates*, 99 F.3d 911, 918 (9th Cir. 1996) (quoting *Gillette v. Delmore*, 979 F.2d 1342, 1346–47 (9th Cir. 1992)).  "Liability for improper custom may not be predicated on isolated or sporadic incidents; it must be founded upon practices of sufficient duration, frequency and consistency that the conduct has become a traditional method of carrying out policy." *Trevino*, 99 F.3d at 918; *see also Meehan v. Cty. of Los Angeles*, 856 F.2d 102, 107 (9th Cir. 1988) (finding two incidents insufficient to establish custom).

Second, a plaintiff can prevail on a § 1983 claim by identifying acts or omissions, such as a failure to train employees on their legal duties not to violate citizens' rights. *Connick v. Thompson*, 563 U.S. 51, 61 (2011).  However, "[a] municipality's culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train." *Id.*  To succeed on a § 1983 claim alleging a

1  failure to train, the challenged action must amount to "deliberate indifference to the

2  rights of persons with whom the untrained employees come into contract." *Id*.

3  (internal brackets and citation omitted). Deliberate indifference is a high standard

4  that requires proof of a municipal actor's disregard for a known or obvious

5  consequence of his action. *Id*. Thus, when a government entity is on actual or

6  constructive notice that a particular omission in its training program causes

7  employees to violate citizens' constitutional rights, the government entity may be

8  deemed deliberately indifferent if it continues to retain the same training program.

9  *Id.*

10     Finally, *Monell* liability may be imposed when "the individual who

11  committed the constitutional tort was an official with final policy-making authority

12  or such an official ratified a subordinate's unconstitutional decision or action and

13  the basis for it." *Clouthier*, 591 F.3d at 1250 (internal quotations and citations

14  omitted).

15     Here, each of Plaintiff's three § 1983 claims generally allege Defendant had

16  policies and procedures that led to the denial of Mr. Rogers's medical care and that

17  Defendant was deliberately indifferent to Mr. Rogers's serious mental health

18  issues. If Plaintiff seeks to establish liability under a specific § 1983 theory, it is

19  unclear from the pleadings and present briefing, which sound primarily in contract

20  and negligence law. For example, Plaintiff discusses at length the Agreement

between Defendant and SCJ, and Defendant's duty to provide mental health care under the Agreement.  ECF No. 57 at 5.  Plaintiff then goes on to analyze the Agreement under state contract law and interpretation.  Yet, a contractual agreement, and a government actor's breach thereof, does not generally rise to the level of a constitutional violation.  *Sariaslan v. Rackley*, No. 2:15-CV-2492-EFB P, 2016 WL 2901583, at *2 (E.D. Cal. May 17, 2016), *aff'd in part, vacated in part,* 678 F. App'x 613 (9th Cir. 2017).  Moreover, Plaintiff's allegations that certain of Defendant's employees breached their contractual duty to provide adequate health care by failing to properly fill out screening and intake forms is insufficient to establish liability under § 1983.  At best, it is evidence of negligence, which also cannot serve as the basis for § 1983 liability.  *See Mangiaracina v. Penzone*, 849 F.3d 1191, 1200 (9th Cir. 2017) (Bybee, J., concurring).

Similarly, in an attempt to identify the policies and procedures that led to Mr. Rogers's constitutional violations, Plaintiff cites to Defendant's "Mental Health Screening and Evaluation" policy manual, alleging the manual instructed Defendant's employees not to treat inmates at the jail.  ECF No. 57 at 12–13.  Plaintiff does not point to a specific written policy that instructs employees not to provide mental health or medical care.  In fact, the policies cited by Plaintiff explicitly state Defendant's employees were required to screen for mental health

issues and provide referrals when necessary. *Id.* Moreover, the evidence indicates Defendant's employees followed these policies and procedures to provide the required mental health screenings. *See, e.*g., ECF No. 71 at 12–19. While certain forms were initially left incomplete upon Mr. Rogers's intake because he was uncooperative, the forms were later completed when Mr. Rogers was cooperative. ECF No. 36 at 4, ¶¶ 2–4. Defendant's employees continued to evaluate Mr. Rogers during his period of incarceration, as required by Defendant's policies and procedures. ECF No. 71 at 12–19. Plaintiff also does not point to a particular unwritten policy or procedure or provide evidence of Defendant's historical failures to treat inmates pursuant to an unwritten policy. Plaintiff's unsubstantiated and conclusory allegations are insufficient to establish constitutional violations.

Even if Plaintiff could point to a specific policy or procedure that caused Defendant's employees to violate Mr. Rogers's constitutional rights, Mr. Rogers's isolated experiences cannot serve as the basis for § 1983 liability. Plaintiff must point to a policy of sufficient "duration, frequency and consistency" to show it had become Defendant's traditional method of carrying out the policy. *Trevino*, 99 F.3d at 918. Plaintiff does not provide evidence of any other inmate civil rights violations resulting from Defendant's alleged failure to adequately evaluate, screen, and treat mental health issues. Finally, Plaintiff has failed to meet the high standard for deliberate indifference because there is no evidence that Defendant

knew its practices led to constitutional rights violations and deliberately

disregarded the effects of those practices.

The undisputed evidence indicates Defendant's employees followed the

required intake procedures and evaluations when Mr. Rogers was booked into the

jail and continued to provide the required treatment as outlined in Defendant's

Agreement with SCJ.  *See, e.g.*, ECF Nos. 36 at 4–15, ¶¶ 1–73; 59 at 4, ¶¶ 13–14,

at 5, ¶¶ 16–17, at 6, ¶¶ 20–21, at 7, ¶¶ 26–27; 71 at 14–19.  Even viewing the

evidence in the light most favorable to Plaintiff, there is no indication of a policy

or procedure of sufficient duration or frequency that led to constitutional

violations, or that Defendant knew of, and deliberately disregarded, the effects of

an unconstitutional policy.  Accordingly, Defendant is entitled to summary

judgment on the § 1983 claims.

**B. State Law Claims**

Plaintiff advances two state law claims against Defendant under the theories

of negligence and wrongful death.  ECF No. 1 at 14–16, ¶¶ 55–62, at 20–21, ¶¶

82–87.  Defendant moves for summary judgment on both claims, arguing Plaintiff

cannot prove the causation element of the negligence claim, and without the

negligence claim, the derivative wrongful death claim fails.  ECF No. 32.

*1. Negligence Claim*

Plaintiff alleges Defendant had a duty to provide Mr. Rogers safe

confinement conditions and all necessary medication, medical care, and mental health care; Defendant breached that duty; and Defendant's breach directly and proximately caused Mr. Rogers to suffer harm resulting in death.  ECF No. 1 at 14–16, ¶¶ 55–62.  Plaintiff's negligence claim is premised on the theory of corporate negligence.[1]  ECF No. 55 at 8.

The doctrine of corporate negligence is based on a nondelegable duty that a hospital owes directly to its patients.  *Douglas v. Freeman*, 117 Wash.2d 242, 248 (1991).  There are four duties owed by a hospital under the doctrine: (1) "to use reasonable care in the maintenance of buildings and grounds for the protection of the hospital's invitees; (2) to furnish the patient supplies and equipment free of defects; (3) to select its employees with reasonable care; and (4) to supervise all persons who practice medicine within its wall."  *Id*.  Plaintiff takes issue with the duty of supervision.  ECF No. 55 at 8.

---

[1]    Defendant argues Plaintiff raises the corporate negligence claim for the first time at summary judgment.  ECF No. 67 at 15.  However, a review of Plaintiff's Complaint reveals articulated elements of a corporate negligence claim.  *Compare* ECF No. 1 at 14–16, ¶¶ 55–62 *with Douglas v. Freeman*, 117 Wash.2d 242, 248 (1991).

ORDER ON PENDING MOTIONS ~ 14

1      "In a professional malpractice case, the standard of care is based on proof of

2 the customary and usual practices within the profession." *Douglas*, 117 Wash.2d

3 at 248.  The standard of care to which a hospital should be held may be defined by

4 the Joint Commission on Accreditation of Hospitals, a hospital's own bylaws, or

5 by statute.  *Id*.  Generally, the standard of care must be established by expert

6 testimony.  *Id*.  Expert testimony is also generally required to prove causation.  *Id*.

7 at 252.

8      Plaintiff has submitted expert testimony from two expert witnesses, Dr.

9 Michael Rogers and Dr. Matthew Layton.  ECF No. 37-1 at 302–37, at 339–67.

10 Defendant moves to strike the testimony from both experts on the grounds that Dr.

11 Rogers failed to timely disclose the factual basis forming his knowledge of

12 Washington standards of practice and because Dr. Layton lacks the required

13 qualifications to opine about the standards of care in a correctional setting.  ECF

14 Nos. 34, 35.  The Court will briefly address these motions before concluding the

15 analysis of Plaintiff's corporate negligence claim.

16      As an initial matter, witnesses must be competent to testify.  Fed. R. Evid.

17 601.  "[I]n civil actions and proceedings, with respect to an element of a claim or

18 defense as to which State law supplies the rule of decision, the competency of a

19 witness shall be determined in accordance with State law." *Trevino v. United

20 States*, 804 F.2d 1512, 1516 (9th Cir. 1986) (citing Fed. R. Evid. 601).  In the

context of a medical negligence claim under Washington law, "expert testimony will generally be necessary to establish the standard of care . . . and most aspects of causation . . . ." *Young v. Key Pharms., Inc.*, 112 Wash.2d 216, 228 (1989) (citation omitted). Washington law grants broad discretion to the trial judge in ruling on the competence of expert witnesses. *Id.* (citing *Balmer v. Dilley,* 81 Wash. 2d 367, 372 (1972) (en banc)). Once the competency standards under Rule 601 are satisfied, the trial court must apply the standards of Rule 702 to determine whether the expert testimony is admissible. *Liebsack v. United States*, 731 F.3d 850, 857 (9th Cir. 2013).

Expert testimony is admissible if it meets the standards set forth in Federal Rule of Evidence 702, which provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.

Trial courts perform a "gatekeeping" function to ensure that expert testimony conforms to Rule 702's admissibility requirements. *Daubert v. Merrell Dow Pharmaceuticals,* 509 U.S. 579, 597 (1993). When determining

admissibility, courts engage in a two-part inquiry. *Id*. First, courts must determine whether a reliable methodology was used by the expert witness. *Id*. at 595. *Daubert* provides a non-exclusive list of factors a court may consider in determining reliability, including (1) whether a theory or technique can be tested, (2) whether it has been subjected to peer review and publication, (3) whether there is a known or potential rate of error, and (4) whether the theory or technique is "generally accepted" in the scientific community." *Id*. at 593–94. Trial judges possess broad latitude to determine whether these specific factors are reasonable measures of reliability in a particular case. *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 153 (1999). Second, courts must evaluate the relevancy of the testimony. *See* Fed. R. Evid. 702.

If the testimony is determined to be reliable and relevant, any alleged weakness in an expert's methodology or conclusion goes to the degree of credibility to be accorded to the evidence, not to the question of admissibility. *See Primiano v. Cook,* 598 F.3d 558, 564 (9th Cir. 2010) ("When an expert meets the threshold established by Rule 702 as explained in *Daubert,* the expert may testify and the jury decides how much weight to give that testimony.").

### a. Dr. Layton

Defendant moves to strike the expert testimony of Dr. Layton. ECF No. 34. Defendant purports to challenge Dr. Layton's reliability on the grounds that Dr.

1    Layton lacks the specialized knowledge necessary to opine about patient treatment

2    in a corrections setting.  *Id*.  Defendant further argues Washington law requires

3    Plaintiff's experts to be "professional peers" with Defendant's employees, and

4    because Dr. Layton is not a nurse or nurse practitioner, he cannot opine to the

5    standard of care that should have been practiced by Defendant's nurses who

6    provided care to Mr. Rogers.  ECF No. 69 at 4.

7         The Court is not persuaded by Defendant's arguments.  First, Defendant

8    does not challenge Dr. Layton's methodology.  Rather, Defendant takes issue with

9    Dr. Layton's qualifications.  However, Dr. Layton is a board-certified psychiatrist

10   and neurologist.  ECF No. 37-1 at 340.  As such, he has the knowledge and

11   expertise to opine as to the psychiatric care provided to Mr. Rogers.  Defendant's

12   complaints regarding Dr. Layton's experience in a particular medical setting goes

13   to the credibility of the evidence, not its admissibility.

14        Furthermore, Washington law requires medical expert testimony to be based

15   on a "reasonable degree of medical certainty."  *Reese v. Stroh*, 128 Wash. 2d 300,

16   309 (1995) (citation omitted).  "[A] physician with a medical degree will ordinarily

17   be considered qualified to express an opinion with respect to any medical question,

18   including questions in areas in which the physician is not a specialist, so long as

19   the physician has sufficient expertise to demonstrate familiarity with the medical

20   procedure or problem at issue in the action."  *White v. Kent Med. Ctr., Inc.,* 61

1   Wash. App. 163, 173 (1991); *McKee v. Am. Home Prod., Corp.*, 113 Wash. 2d

2   701, 706 (1989).  Importantly, a physician may also testify as to a nurse's standard

3   of care.  *Hall v. Sacred Heart Med. Ctr.*, 100 Wash. App. 53, 60 (2000).  As a

4   physician, Dr. Layton is qualified to opine regarding the psychiatric care provided

5   to Mr. Rogers, whether provided by a nurse or physician.

6        Finally, with regard to relevance, Defendant asserts that Dr. Layton's

7   opinion fails to identify proximate cause.  ECF No. 69 at 9.  This argument also

8   goes to the weight of the evidence, not its admissibility.  Dr. Layton's report

9   analyzing the psychiatric care provided to Mr. Rogers is relevant to Plaintiff's

10   negligence claim.

11        Defendant also seeks to strike Dr. Layton's Declaration filed on February

12   15, 2023, arguing the declaration contains previously undisclosed information.  *Id.*

13   at 12.  When a party fails to disclose or supplement witness information as required

14   by Rule 26(a) or (e), Rule 37(c)(1) permits courts to strike documents in whole or

15   in part to prohibit the use of the information to supply evidence at a motion,

16   hearing, or trial.  Fed. R. Civ. P. 37(c)(1).  "Two express exceptions ameliorate the

17   harshness of Rule 37(c)(1): the information may be introduced if the parties'

18   failure to disclose the required information is substantially justified or

19   harmless."  *Yeti by Molly, Ltd. v. Deckers Outdoor Corp.*, 259 F.3d 1101, 1106

20   (9th Cir. 2001).  To determine whether substantial justification and harmlessness

exist, the Court looks to several factors, including "(1) prejudice or surprise to the party against whom the evidence is offered; (2) the ability of that party to cure the prejudice; (3) the likelihood of disruption of trial; and (4) bad faith or willfulness in not timely disclosing the evidence." *Silvagni v. Wal-Mart Stores, Inc.*, 320 F.R.D. 237, 241 (D. Nev. 2017).

It does not appear Plaintiff acted in bad faith or willfully withheld the newly disclosed information. Because the Court ultimately finds in favor of Defendant, the addition of this new information will not prejudice Defendant, nor will it disrupt a trial. Therefore, the Court does not find it necessary to strike Dr. Layton's untimely declaration.

The Court determines Dr. Layton's testimony is based on reliable methodology and is relevant. Defendant's Motion to Strike Dr. Layton's Expert Testimony (ECF No. 34) is **DENIED**.

### b. Dr. Rogers

Defendant moves to strike the expert testimony of Dr. Rogers on similar grounds. ECF No. 35. Specifically, Defendant asserts Dr. Rogers lacks the necessary expertise in pharmacology to opine about the dosage of Mr. Rogers's antipsychotic medication. *Id*. at 6. This argument is unpersuasive. Dr. Rogers is a board-certified psychiatrist; therefore, he has the requisite experience and training to opine on the psychiatric care provided to Mr. Rogers, including any prescribed

and administered medication.  Dr. Rogers's experience with pharmacology, or lack thereof, goes to his credibility.

Defendant also moves to strike on the grounds that Dr. Rogers's original report does not establish Dr. Rogers's knowledge of the Washington standard of care; it was not until after Defendant moved to strike that Dr. Rogers provided a declaration stating he reviewed RCW 7.70 and consulted with Dr. Layton to gain knowledge of the Washington standard of care.  ECF No. 54 at 4, ¶ 13.  Because the Court ultimately finds in favor of Defendant, the inclusion of this new information will not prejudice Defendant or disrupt a trial.  It also does not appear it was withheld in bad faith.  Accordingly, the Court determines Dr. Rogers's testimony is based on reliable methodology and is relevant.   Defendant's Motion to Strike Dr. Rogers's Expert Testimony (ECF No. 35) is **DENIED**.

Returning to Plaintiff's corporate negligence claim, Defendant moves for summary judgment on the grounds that Plaintiff's experts cannot establish that the alleged violations of standard of care caused Mr. Rogers's death.  ECF No. 32 at 2. Specifically, Defendant asserts the expert witnesses cannot identify the therapeutic level of medication that would have prevented Mr. Rogers's death and even concede that other patients who receive prescribed therapeutic levels of the same medication can and do commit suicide.  *Id*. at 11.  Additionally, Defendant argues the expert reports identify Defendant's employees as the individuals who breached

1    the standard of care, not Defendant, as required for a corporate negligence claim.

2    *Id*. at 14.

3         Dr. Layton opines that "Mr. Rogers received inappropriate medication

4    management, including being unmedicated for his Schizophrenia during a crucial

5    period of time while incarcerated, and under-medicated thereafter."  ECF No. 37-1

6    at 365.  To support this conclusion, Dr. Layton cites Mr. Rogers's prescription

7    history immediately before and during his incarceration.  Dr. Layton notes Mr.

8    Rogers was prescribed oral antipsychotic medications on September 26, 2017,

9    which were to be taken daily.  *Id*. at 360.  However, Dr. Layton surmises that Mr.

10   Rogers was not adhering to his prescriptions because the prescriptions were

11   switched to the long-acting injectable antipsychotic, Risperdal (generically known

12   as risperidone), on November 28, 2017.  *Id*. at 360.  Mr. Rogers was due to receive

13   the first dose of Risperdal on November 28, 2017.  ECF No. 36 at 2, ¶¶ 4, 7.

14        The parties dispute whether Mr. Rogers in fact received this first dose.  ECF

15   No. 71 at 9.  Dr. Layton's report assumes he did not.  ECF No. 37-1 at 360.  Dr.

16   Layton acknowledges Mr. Rogers was prescribed oral risperidone on November

17   30, 2017 while he was incarcerated and that he continued to take the oral

18   risperidone until December 6, 2017.  *Id*. at 361.  However, Dr. Layton notes Mr.

19   Rogers did not receive any antipsychotic medication between December 7, 2017

20   and December 12, 2017; instead, he received a low dose of an antidepressant.  *Id*.

Dr. Layton's report does not indicate why Mr. Rogers stopped receiving antipsychotic medication during that time.

Dr. Layton acknowledges Mr. Rogers received an injection of Risperdal on December 12, 2017, as scheduled.  ECF No. 37-1 at 361.  Dr. Layton opines Mr. Rogers attempted suicide on December 22, 2017 and that Mr. Rogers had "been extremely symptomatic for weeks" at that point.  *Id*. at 362.  The parties dispute whether Mr. Rogers's actions on December 22, 2017 were a suicide attempt.  ECF No. 71 at 19.  Notably, Dr. Layton does not opine as to what dose of medication, if any, would have prevented Mr. Rogers's suicidal behavior.  Instead, Dr. Layton relies on the FDA prescribing guidelines to support his conclusion that Mr. Rogers was inadequately medicated.  ECF No. 37-1 at 361, at 208.  When questioned during his deposition as to whether dosing was affected by individual patient characteristics like weight, Dr. Layton stated, "there's a range that does vary by individual because we have different metabolic rates . . . or . . . different body forms and sizes."  *Id*. at 208.  Dr. Layton's opinion did not account for Mr. Rogers's individual characteristics.

Additionally, Dr. Layton does not provide an opinion regarding Defendant's policies, procedures, or employee trainings.  During his deposition, Dr. Layton acknowledged he was not critical of Defendant's recordkeeping program nor did he have an opinion as to whether Defendant had a policy that caused Mr. Rogers's

suicide.  ECF No. 37-1 at 203, at 211.  Rather, Dr. Layton's criticism relates to how Defendant's individual employees completed the forms and administered Mr. Rogers's medication.  ECF No. 67 at 12.

Turning to Dr. Rogers's report, Dr. Rogers opines that Mr. Rogers's suicidal behavior occurred "because he was under-treated with antipsychotic medication." ECF No. 37-1 at 305.  Dr. Rogers bases his conclusion on the premise that Mr. Rogers's outpatient dosing regimen was higher than what he received while incarcerated.  *Id*. at 306.  Specifically, Dr. Rogers questions why Defendant's employee halved Mr. Rogers's dosage of the injectable Risperdal administered on December 12, 2017.  *Id*. at 308.  However, Dr. Rogers admitted during his deposition that he misread the prescription and that Mr. Rogers did in fact receive the same dosage he was prescribed prior to his incarceration.  *Id*. at 233.  Dr. Rogers further acknowledged during his deposition that some people who are properly dosed with antipsychotic medications, including risperidone, can and do complete suicide.  *Id*. at 218.  Dr. Rogers's opinion does not identify what dosing would have prevented Mr. Rogers's suicidal behavior, and when questioned on the issue during deposition, Dr. Rogers stated he could not say for sure what dose was needed.  *Id*. at 237–38.  Finally, like Dr. Layton, Dr. Rogers focuses on the actions of Defendant's employees to conclude Mr. Rogers's alleged medication mismanagement caused his death.  ECF No. 67 at 14.

Defendant also provided expert testimony regarding Mr. Rogers's medication management.  Dr. Simonian, a state-certified pharmacist, opines that Mr. Rogers had therapeutic blood concentrations of risperidone between November 30, 2017 and December 7, 2017, and between December 19, 2017 and January 3, 2017.  ECF No. 37-1 at 247.  Dr. Simonian bases his opinion on Mr. Rogers's weight at the time of administration and the assumption that Mr. Rogers received the initial dose of Risperdal on November 28, 2017.  *Id*.  Dr. Simonian acknowledges Mr. Rogers was below therapeutic levels between December 8, 2017 and December 18, 2017 but notes the care provider records did not indicate there were any safety concerns during that timeframe.  *Id*. at 249.  Dr. Simonian further acknowledges Mr. Rogers was not administered the Risperdal injection on December 26, 2017, as scheduled.  *Id*. at 250.  However, Dr. Simonian states the December 26 injection would not have achieved therapeutic blood levels until January 16, 2018.  *Id*.  In any event, Dr. Simonian notes Mr. Rogers was also receiving daily doses of oral Risperdal beginning December 21, 2017, which he opined would have provided adequate therapeutic blood concentrations, even without the December 26 injection.  *Id*.

Viewing the evidence in a light most favorable to Plaintiff, a reasonable jury could conclude Mr. Rogers did not receive his first dose of Risperdal on November 28, 2017 prior to his arrest and was undermedicated upon arrival at SCJ.  A

reasonable jury could also conclude Mr. Rogers was undermedicated for at least a portion of his time at SCJ.  However, it is undisputed Mr. Rogers began receiving his antipsychotic medication approximately two weeks before his suicide, which included a daily dose of oral Risperdal.  It is further undisputed that Risperdal and other antipsychotic medications do not always prevent suicide, even when therapeutic levels are achieved.  It is also undisputed that it is not possible to state with a reasonable degree of medical certainty what dose of medication, if any, would have prevented Mr. Rogers's suicide.

While Plaintiff has demonstrated there are genuine issues of fact going to the adequacy of Mr. Rogers's antipsychotic medication dosing, that is not the relevant factual inquiry for the corporate negligence claim.  The question is whether there was some conduct by Defendant *as an entity* that caused Mr. Rogers's suicide.  *See Grae-El v. City of Seattle*, --- F. Supp. 3d. ---, No. C21-1678JLR, 2022 WL 2952381, at *9 (W.D. Wash. July 26, 2022).  As discussed *supra*, Plaintiff has failed to identify any policy or procedure implemented by Defendant that caused Mr. Rogers's death.  In fact, Plaintiff concedes Defendant had written policies requiring its employees to complete screenings and intake forms and to make necessary referrals for mental health treatment.  ECF No. 55 at 8.  Plaintiff's allegations regarding the failures of these policies relate to the individual conduct of Defendant's employees, which is insufficient for a corporate negligence claim.

1    Relatedly, Plaintiff's experts did not provide opinion evidence as to Defendant's

2    conduct as an entity; their opinions were limited to the conduct of Defendant's

3    individual employees. *See id.* at 9. Plaintiff also failed to demonstrate Defendant

4    inadequately supervised its employees. In fact, Plaintiff provides no evidence or

5    arguments beyond unsubstantiated conclusions regarding Defendant's supervision.

6    *See generally*, ECF No. 55.

7        Viewing the evidence in a light most favorable to Plaintiff and drawing all

8    reasonable inferences therefrom, the Court concludes Plaintiff has failed to

9    demonstrate there are genuine issues of fact regarding the corporate negligence

10    claim. Plaintiff's experts could not conclusively state Mr. Rogers's medication

11    dosing was the cause of his suicide nor did they identify any policy or training

12    failure that caused Mr. Rogers's death. Consequently, Defendant is entitled to

13    summary judgment on Plaintiff's corporate negligence claim.

14        *2. Wrongful Death*

15        Plaintiff's derivative claim for wrongful death relies on a finding that

16    Defendant proximately caused Mr. Rogers's suicide. ECF No. 1 at 20–21, ¶¶ 82–

17    87. Having concluded there is insufficient evidence to support such a finding,

18    Plaintiff's claim must fail. Defendant is entitled to summary judgment on

19    Plaintiff's wrongful death claim.

20

**ACCORDINGLY, IT IS HEREBY ORDERED:**

1. Defendant's Motion for Partial Summary Judgment (ECF No. 33) is **GRANTED**. The federal law claims asserted against Defendant NaphCare, Inc. are **DISMISSED with prejudice**.

2. Defendant's Motion for Partial Summary Judgment (ECF No. 32) is **GRANTED**. The state law claims asserted against Defendant NaphCare, Inc. are **DISMISSED with prejudice**.

3. Defendant's Motions to Strike and Exclude Experts (ECF Nos. 34, 35) are **DENIED**.

4. Plaintiff's Motion for Partial Summary Judgment (ECF No. 29) is **DENIED as moot**.

The District Court Executive is directed to enter this Order, furnish copies to counsel, and **close** the file.

DATED April 3, 2023.



THOMAS O. RICE
United States District Judge

ORDER ON PENDING MOTIONS ~ 28